IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL FAMILY PLANNING<br>  AND REPRODUCTIVE HEALTH<br>  ASSOCIATION, INC.,<br>1627 K Street, N.W., 12ᵗʰ Floor<br>Washington, D.C. 20006, | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No.: |
| JOHN ASHCROFT,<br>ATTORNEY GENERAL OF THE UNITED<br>STATES, U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001<br>in his official capacity, | ) ) ) ) ) ) ) | |
| TOMMY G. THOMPSON, SECRETARY,<br>United States Department of Health and<br>  Human Services,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br>in his official capacity, | ) ) ) ) ) ) ) | |
| ELAINE L. CHAO, SECRETARY<br>United States Department of Labor<br>Frances Perkins Building<br>200 Constitution Avenue, N.W.<br>Washington, D.C. 20210<br>in her official capacity, | ) ) ) ) ) ) ) | |
| and | ) ) | |
| ROD PAIGE, SECRETARY<br>Office of the Secretary<br>United States Department of Education<br>400 Maryland Avenue, S.W.<br>Washington, D.C. 20202<br>in his official capacity, | ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    This is an action for declaratory and injunctive relief regarding a recently-enacted provision of appropriations law commonly referred to as the Weldon Amendment. The Weldon Amendment prohibits recipients of the FY 2005 appropriation for the Departments of Health and Human Services ("HHS"), Education ("DOE"), and Labor ("DOL") from subjecting any "health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." The term "health care entity" is defined to include all individual health professionals. This provision will cause severe harm to plaintiff National Family Planning and Reproductive Health Association's ("NFPRHA") members (and a great many others), which as a result of the Amendment, will at least face a loss of funds and possible civil and criminal sanctions.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, § 1346, and § 1361. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201– 02 and related equitable relief pursuant to 28 U.S.C. § 1651. Venue is proper under 28 U.S.C. § 1391(e). The United States has waived sovereign immunity pursuant to 5 U.S.C. § 702.

## THE PARTIES

### Plaintiff

3.    The National Family Planning and Reproductive Health Association ("NFPRHA") is a nonprofit membership organization organized under the laws of the District of

Columbia, with offices and its principal place of business in the District of Columbia.

4.    NFPRHA was established to improve and expand the delivery of voluntary, comprehensive, and culturally sensitive family planning and reproductive health care services throughout the United States and to support reproductive freedom.

5.    NFPRHA's membership comprises virtually all of the domestic family planning field including clinicians, administrators, researchers, educators, advocates and consumers. NFPRHA is the only national family planning organization that brings together among its membership: private nonprofit clinics, State, county, and local health departments, "umbrella" family planning councils, independent, free-standing family planning clinics, hospital-based clinics, and other family planning organizations and providers  A large part of NFPRHA's membership administers and/or provides direct services using Title X funds.

## Defendants

6.    Defendant, Attorney General John Ashcroft is charged with the responsibility for prosecuting False Claims Act ("FCA"), 31 U.S.C. §§ 3729 - 31, violations on behalf of the United States through the Department of Justice as well as for bringing criminal sanctions against federal funds recipients for their violations of federal criminal law.  He is sued in his official capacity.

7.    Defendant Tommy G. Thompson is the Secretary of HHS which administers the Title X, Medicaid, Medicare, Maternal/Child Health Block Grant, the Ryan White HIV/AIDS, and many other programs.  HHS is one of the agencies to which the Weldon Amendment applies. Secretary Thompson is sued in his official capacity.

8.    Defendant Elaine Chao is the Secretary of DOL, one of the agencies to which the Weldon Amendment applies.  She is sued in her official capacity.

9.    Defendant Rod Paige is the Secretary of DOE, one of the agencies to which the Weldon Amendment applies.  He is sued in his official capacity.

## STATUTORY BACKGROUND

### Title X of the Public Health Service Act

10.    Title X of the Public Health Service Act ("PHS") Act, 42 U.S.C. § 300, authorizes the largest federally-funded family planning program.  Under Title X,  HHS makes grants to public agencies and private nonprofit organizations to enable those organizations to provide family planning services to the program's beneficiaries.

11.    The Act authorizes the Secretary to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Grants and contracts under Title X must "be made in accordance with such regulations as the Secretary may promulgate."  42 U.S.C. at § 300a-4.

12.    The Act also authorizes the Secretary to make formula grants to State health authorities to "assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." 42 U.S.C. § 300a(a).

13.    The broad range of services provided by Title X programs includes, *inter alia*,

4

prescribing contraceptives, advising on natural family planning, counseling and referring patients to other provides of medical services, and testing for pregnancy.

14.    Clinics receiving Title X funds must provide an array of confidential preventative services including contraceptive services, pelvic exams, pregnancy testing, testing for cervical and breast cancer, screening for high blood pressure and anemia, screening for sexually transmitted diseases, including HIV, basic infertility services, health education and other health and social services.

15.    Clinics receiving Title X funds not only provide critical health services, they also save the federal Government money. Title X clinic services prevent pregnancies, reduce the need for abortion, lower rates of sexually transmitted disease, including HIV, detect breast and cervical cancer at its earliest stages, and generally improve women's overall health. Money spent on publicly- funded family planning saves much more in terms of pregnancy-related and newborn care under Medicaid.

16.    The vast majority of Title X clients are uninsured and do not qualify for Medicaid. However, anyone regardless of income can receive services at a Title X funded clinic. Approximately sixty-five percent of Title X clients have incomes below the federal poverty level (earning less than $15,260 per year for a family of three) and receive services at no cost. Ninety-two percent have incomes below 200% of the federal poverty level and receive services at a discounted rate. Seventy percent of women receiving subsidized family planning services are age 20 or over and approximately 63% are white.

17.    For federal fiscal year 2004, Title X was funded at approximately $265 million.

18.    NFPRHA's membership includes approximately 4000 entities that receive Title X

5

funds and are located throughout the United States. They are comprised of State health and social service departments, County local health and social service departments, family planning councils, hospital-based clinics, and independent clinics and providers. Title X funding is typically provided through grants to Statewide or regional agencies and organizations which, in turn, enter into "subgrants" with other agencies and organizations to provide Title X services, although some provide services as well as act as funding intermediaries. Most of the actual services are delivered by nonprofit organizations that are either dedicated to family planning activities (the majority) or provide a broader range of ambulatory health services (the minority). These clinics receive funds not only from Title X, but also from patient fees, private and public insurance (*e.g.*, Medicaid) and from other federal and State grant programs.

19.     The numbers of these clinics are more than 4,600 nationwide. State, county and local health departments run the majority (approximately 57%) of clinics that receive Title X funds.

20.     Because Title X is limited to pre-conceptional services, the program does not furnish services related to childbirth. Only in the context of a pregnancy diagnosis and a referral out of the Title X program is a pregnant woman given transitional information.

21.     The Title X statute prohibits the use of program funds to pay for abortions. 42 U.S.C. § 300a-6. However, in keeping with established medical ethics, a woman is entitled to receive non-directive counseling and referrals upon request regarding all of her available options including prenatal care and delivery, infant care, foster care or adoption, and termination.

22.     Regulations implementing Title X (at 42 C.F.R. Part 59) require that a Title X recipient of grant funds:

6

> Offer pregnant women the opportunity to be provided information
> and counseling regarding each of the following options:
>
> > (A) Prenatal care and delivery;
> > (B) Infant care, foster care or adoption; and
> > (C) Pregnancy termination.

42 C.F.R. § 59.5(a)(5)(I).

23.     If a patient makes a request for information concerning the any of the services

listed above, the regulations require a Title X clinic to:

> . . . provide neutral, factual information and nondirective counseling on each of
> the options, and referral upon request, except with respect to any option(s) about
> which the pregnant woman indicates she does not wish to receive such
> information and counseling.

42 C.F.R. § 59.5(a)(5)(ii). Thus, the regulations require Title X grantees and subgrantees to refer

patients for an abortion if the patient so requests.

24.     Just as with prime contractors in a federal procurement setting, HHS enforces

Title X requirements by holding its grantees responsible (both financially and otherwise) for the

performance of subgrantees. As a consequence, in executing an assurances of compliance, Title

X grantees are not only pledging that they are in full conformity with those sections but that all of

their subgrantees are as well. In the event any of those subgrantees are not in compliance, the

grantee will have filed a false assurance and be directly subject to all sanctions that flow from

such a false submission.

25.     Title X grantees when applying for Title X funds, for example, must provide HHS

with a certification that they:

> *Will comply with all Federal statutes relating to nondiscrimination.* These
> include but are not limited to: (a) Title VI of the Civil Rights Act of 1964 (P.L.

88-352) which prohibits discrimination on the basis of race, color, or national origin; (b) Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§ 1681-1683, and 1685-1686), which prohibits discrimination on the basis of sex; (c) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. §§ 794), which prohibits discrimination on the basis of handicaps; (d) the Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101-6107), which prohibits discrimination on the basis of age. . . (emphasis added).

HHS, Office of Public Health and Science Grant Application (Form OPHS-1) at Assurances.

26.    Title X grantees also submit a certification in applying for Title X funds stating that:

> The authorized official signing for the applicant organization certifies that the statements made herein are true, complete, and accurate to the best of his or her knowledge, and that he or she is aware that any false, fictitious, or fraudulent statements or claims may subject him or her to criminal, civil, or administrative penalties. The official signing agrees that the applicant organization will comply with the DHHS, PHS, and OPHS terms and conditions of award, if a grant is awarded as a result of this application.

HHS, Office of Public Health and Science Grant Application (Form OPHS-1) at 13, Certification No. 4.

27.    State and local governments receiving Title X or other federal funding, including funding (*e.g.*, Medicaid) such governments provide to Title X grantees and subgrantees, make these certifications as well. They are also responsible for ensuring their subrecipients' compliance with these requirements as well.

**Other Funding Streams**

28.    As described above, Title X grantees include a host of different entities including State and county health and social service departments, hospital-based clinics, community health

8

centers, and independent clinics and providers. Many of these entities also receive other sources

of funds such as Medicaid under Title XIX of the Social Security Act. These other funding

sources have their own set of requirements and assurances that the grantees must meet in order to

remain eligible for funding.

29.    Additionally, grantees and subgrantees of Title X funds must perform their Title X

projects using State and local funds, as well as federal funds. One of the criteria used by HHS in

awarding Title X grants is a Title X project's ability to set forth in its grant application "the

relative availability of nonfederal resources within the community to be served and the degree to

which those resources are committed to the project." 42 C.F.R. § 59.7(a)(6). Thus, Title X

grantees receive grants, in part, on the basis of their ability to "leverage" other sources of funds.

30.    In fact, under HHS' implementation of Title X regulations, Title X projects must

use all State and local funding in accordance with Title X requirements.


### The Weldon Amendment

31.    On Saturday, November 20, 2004, Congress passed the Consolidated

Appropriations Act, 2005, P.L. 104-447 (H.R. 4818). The provision giving rise to this case

(sponsored by Congressman David Weldon) appears in Division F of the Act which covers

appropriations for DOL, HHS, DOE, and related agencies.

32.    Pertinent sections, including the provision at issue, provide:

> SEC. 507. (a) None of the funds appropriated under this Act, and none of the
> funds in any trust fund to which funds are appropriated under this Act, shall be
> expended for any abortion.

> (b) None of the trust funds appropriated under this Act, and none of the funds in

any trust fund to which funds are appropriated under this Act, shall be expended for health benefits coverage that includes the coverage of abortion.

(c) The term 'health benefits coverage' means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

SEC. 508.  (a) The limitations established in the preceding section shall not apply to an abortion - -

. (1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State,local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

(d)(1) *None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.*

(2) *In this subsection, the term "health care entity" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization or plan.*

(Emphasis added to the provision on which this case is based.)

33.    President Bush signed the Consolidated Appropriations Act of 2005 on December

8, 2004.

## INJURIES

34.    Recipients of Title X funds must sign and submit to the Secretary of HHS at their

peril assurances of compliance.  As a consequence, such recipients are exposed to a number of

sanctions including, but not limited to, the following:

(a)    Civil and criminal penalties for filing a false claim with HHS.  Enforcement of

these penalties is by the Attorney General and the U.S. Department of Justice.  In

one instance, the False Claims Act, 31 U.S.C. §§ 3729 - 31, enforcement can be

through individual citizens, not federal officials, i.e, through a *qui tam* lawsuit.

Title X programs are subject to intense scrutiny and the potential for *qui tam*

lawsuits is great.

(b)    Any refusal to sign the assurance verbatim will lead to termination of Title X

funding.  Thus, recipients are unable to condition or qualify their assurance in any

way.

(c)    A violation of the assurance can also produce a range of HHS-imposed sanctions

including grant suspension or termination, a "voiding" of the grant (with the

recipient) obligated to repay all funds received since the date of the assurance),

and debarment from all federal program, including the Medicaid program on

which Title X recipients rely.

35.    State and local governments receiving Title X funds make the same assurances

concerning Title X funding and are also responsible for ensuring their subrecipients' compliance

11

with Title X compliance. State and local governments that receive sources of funding other than Title X will sustain injuries to those programs as well. State and local governments' use of their own funding to provide abortions or programs that allow women access to obtain an abortion would disqualify those State and local governments from receiving funds under the FY 2005 appropriations law from HHS, DOE, and DOL.

36.     The threat of imposition of these sanctions arises from the Amendment's language, the vagueness of the language, and the inability of affected parties to discern an underlying rationale for the Amendment. Title X programs are subject to intense scrutiny by several organizations and a large number of individuals that/who object to abortions or any related activity in support of abortions. These organizations and individuals have been known to monitor those projects' activities and can be expected to engage intensively in monitoring compliance with the Weldon Amendment. These same organizations and individuals can be expected to avail themselves of any third party rights of action they may have to enforce the Amendment's terms either against Title X recipients or State or local programs dealing with such recipients.

37.     The Weldon Amendment's anti-discrimination provision appears to runs directly counter to the Title X requirement contained in 42 C.F.R. § 59.5 that grantees and subgrantees of Title X are required to refer patients for an abortion if the patient so requests. Thus, Title X grantees are operating under a requirement to take actions that the Weldon Amendment might bar.

38.     Typically, if a physician is requested by a patient to make a referral for abortion and the physician in applying his/her medical judgment believes it is either medically-indicated

12

or otherwise appropriate to provide such a referral, the function of actually providing the referral and associated information is often delegated to a nurse, physician assistant or other paraprofessional who works under the physician's supervision.

39.     The health care providers at the clinics who determine it is medically-indicated or otherwise appropriate to provide such referrals and who may have their referrals impeded by a individual who does not wish to provide patients with referrals will sustain injuries to their rights to speech protected under the First Amendment.  Patients who do not receive the referrals that their physicians intended them to receive may also sustain life-threatening injuries.  In many instances, the physician may never learn that the referral was never provided, or may come by that information after some time has passed.

## COUNT I

40.     Paragraphs 1 through 39 are incorporated by reference as if fully realleged herein.

41.     The Weldon Amendment is unconstitutional for, among others, the reasons set forth below.

42.     The Weldon Amendment violates the due process protections and separation of powers principles of the Constitution in that it is so vague as to be unenforceable.

43.     The Weldon Amendment impedes the rights of Title X clinics and their phsyicians to provide referral services.  Physicians who intend that a patient receive a referral for an abortion as part of the patient's health care will have their First Amendment rights to speech impaired by an individual who refuses to provide such a referral.  Patients whose physicians have intended that they receive such referrals will have their privacy rights violated if other individuals do not provide them with the referral they were meant to receive.

13

44.    The Weldon Amendment imposes unconstitutional obligations on State and all other funding to which it applies and is an unconstitutional exercise of spending power..

## **PRAYER FOR RELIEF**

45.    WHEREFORE, plaintiff prays that the Court:

(A)    Declare that the provisions of the Weldon Amendment relating to subjecting a health care entity to "discrimination" are unconstitutionally vague and overbroad;

(B)    Issue a permanent injunction against implementation and enforcement of the Weldon Amendment's anti-discrimination requirements with respect to plaintiff's members;

(C)    Award plaintiff its reasonable attorneys' fees and costs for bringing this action; and

(D)    Order such other and further relief as the Court may deem just and proper.

Respectfully submitted,

James L. Feldesman (D.C. Bar No. 023796)
Kathy S. Ghiladi (D.C. Bar No. 435484)
Robert A. Graham (D.C. Bar No. 450345)
Grace B. Culley (D.C. Bar No. 486713)*
    (* admission to District Court pending)

Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W. 2nd Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiff*

Date: December 13, 2004

14

# CERTIFICATE OF SERVICE

This is to certify that on this 13th day of December, 2004, I caused a copy of the foregoing

Complaint for Declaratory and Injunctive Relief to be hand delivered to:

United States Attorney Kenneth L. Wainstain
United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C.  20530

and to be sent via certified mail, return receipt requested to:

The Honorable John Ashcroft
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

The Honorable Tommy G. Thompson
Secretary
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C.  20201

The Honorable Elaine L. Chao
Secretary
United States Department of Labor
Frances Perkins Building
200 Constitution Avenue, N.W.
Washington, D.C.  20210

The Honorable Rod Paige
Secretary
United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C.  20202

_____
James L. Feldesman