IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAMILY PLANNING AND ) <br> R E P R O D U C T I V E   H E A L T H ) <br> ASSOCIATION, INC.,              ) <br>                     *Plaintiff*, ) <br>    v.              ) <br>                     ) <br> ASHCROFT, *et al*.,              ) <br>                     *Defendants*.) | Civil Action No. 04-cv-02148-HHK |

**PROPOSED BRIEF AMICI CURIAE OF
CONGRESSMEN HENRY HYDE, DAVE WELDON, M.D., TODD AKIN,
CHARLES PICKERING, JR., C. L. "BUTCH" OTTER AND MARK SOUDER,
AND OF THE AMERICAN CENTER FOR LAW AND JUSTICE, INC.,
IN SUPPORT OF THE DEFENDANTS**

**INTEREST OF PROPOSED AMICI**

The American Center for Law and Justice (ACLJ) is a public interest law firm committed to insuring the ongoing viability of constitutional freedoms in accordance with principles of justice. ACLJ attorneys have argued or participated as amicus curiae in numerous cases involving constitutional issues before the Supreme Court, the United States Court of Appeals for the District of Columbia, this Court and other federal courts. The ACLJ has represented numerous individuals on issues relating to conscientious objection to participation in abortion, emergency contraception and related issues.[1]

The ACLJ's demonstrated commitment to preserving the constitutional rights of American

---

1.   ACLJ litigation in this area includes: Brauer v. Kmart Corp., Case No. C-1-99-618 (S.D. Oh.) (pharmacist's conscientious objection to dispensing post-coital contraceptives was covered under Ohio law prohibiting discrimination against persons who decline to participate in "medical procedures which result in abortion"); Paula Koch v. Indian Health Service, IHS-027-01 (pharmacist refused to dispense the morning-after-pill); Diaz v. County of RS Health, 5:00-CV-00936 (C.D. Cal.) (nurse fired because of her refusal to dispense the so-called morning-after pill).

citizens make it especially interested in a right of conscience for professionals in the health care community. Underlying matters of national policy at issue in this case are not unique to religious objections to abortion; consequently, the outcome of this case is of great interest and significant import to health care providers throughout the country. The proper resolution of this case is a matter of substantial concern to the American Center for Law and Justice because of its organizational commitments.

This brief is also filed on behalf of Representatives Henry Hyde, Dave Weldon, M.D., Todd Akin, Charles Pickering, Jr., C. L. "Butch" Otter, and Mark Souder. These amici currently are members of the United States House of Representatives in the One Hundred Eighth Congress, and have been elected to serve in the One Hundred Ninth Congress. Congressmen Hyde, Weldon, Akin, Pickering and Otter support the provision of law in dispute in the present litigation. Congressmen Hyde and Congressman Weldon, a physician by education and training, introduced the amendment at issue.

The amici urge the Court to deny the motion for a preliminary injunction, and to enter judgment for the Government Defendants.

**SUMMARY OF THE ARGUMENT**

On December 8, 2004, the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, became law. Within the Consolidated Appropriations Act, a number of agency appropriation acts were included, including the Department of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2005. Section 508(d)[2] of the Act, the Hyde-Weldon

---

2. For ease of reference and clarity, the challenged provisions will be referred to throughout this memorandum as the Hyde-Weldon Amendment.

Amendment, imposes a plain and clearly drawn limitation on <u>all funds appropriated under the Act</u>.

The Hyde-Weldon Amendment states:

> None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

Section 508(d). While the plaintiff has asserted a facial challenge to the Hyde-Weldon Amendment on the basis of the amendment's purported impact on the plaintiff's members, described as Title X family planning grantees, it must be understood – and the language of the provision is clear on this point – that the Hyde-Weldon Amendment is more broadly crafted to restrict funding in all programs funded under the Act.

At the same time, because the plaintiff is complaining about the Hyde-Weldon Amendment's impact on would-be grantees under Title X family planning programs,[3] it should be noted that the Hyde-Weldon Amendment serves as a form of protection for those institutions and individuals that refuse to participate in abortion or to provide referrals, funding, insurance coverage or counseling for abortion services. The Hyde-Weldon Amendment does this by denying funding to all government grantees that discriminate against entities that refuse to participate in such practices.

The Hyde-Weldon Amendment limits on all funds appropriated under the Department of Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, 2005. The Amendment's prohibition on funding discriminatory practices applies both to discrimination

---

3.  Title X of the Public Health Service Act is the national family planning program, which provides millions of dollars annually in funding to public and private agencies for "pregnancy prevention." 42 U.S.C. 300 (1982).

Proposed Brief of Amici Curiae Page 3

against institutions and individuals. "Health care entity includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility or organization or plan." Section 508 (d)(2).

In the view of the amici, as set out within, the Hyde-Weldon Amendment is a reasoned exercise of Congress' Spending power to advance its legitimate interest in promoting childbirth over abortion. The limitation is, in kind and character, very like the one previously approved by the Supreme Court in Rust v. Sullivan, 500 U.S. 173 (1991). Because the Hyde-Weldon Amendment is a reasonable exercise of Congress' Spending power well within its authority to prefer childbirth over abortion, the Plaintiff cannot prevail in its facial challenge to the legislation.

"Proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that congress will pass no act not within its constitutional power. This presumption should prevail unless the lack of constitutional authority to pass an act in question is clearly demonstrated." United States v. Harris, 106 U.S. 629, 635 (1883). As the Supreme Court explained in United States v. Morrison, "we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." 529 U.S. 598, 607 (2000). In this is a facial challenge, the plaintiff cannot prevail unless it shows that there is no set of circumstances in which the Hyde-Weldon Amendment can be applied without violating the Constitution:

> This artificially constructed "facial" challenge must fail. As the Supreme Court held in United States v. Salerno, "to mount a successful facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the ... Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we

have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."

Rancho Viejo, LLC v. Norton, 323 F.3d 1062, 1077-78 (D.C. Cir. 2003) (citation omitted).

In addition, because the Court will make a judgment about whether the plaintiff has satisfied the test for the grant of a preliminary injunction, these amici seek to inform the Court that there are other interests at stake than those represented by the plaintiff. Among those important interests is the desirability of vindicating the constitutional authority of Congress to define and fund programs in accord with its Spending Clause authority, and to prefer childbirth over abortion. And, beyond these constitutionally-freighted governmental interests, there are institutions and individuals across the Nation that have been victimized by the precise discrimination addressed by the Hyde-Weldon Amendment. These institutions and individuals, opposed to participating in abortion practices, will be irreparably injured if the injunction bars the Government Defendants from giving effect to the Hyde-Weldon Amendment.

## ARGUMENT[4]

While the United States Supreme Court has concluded that women have a liberty interest that enables them to receive reproductive health services,[5] the Court has never recognized corresponding

---

4. Other significant defects in the case presented by the Plaintiff appear. For example, the plaintiff does not claim that it suffers from any present injury. Consequently it lacks standing to complain on its own behalf. Recognizing the difficulty that its own lack of injury presents, the Plaintiff asserts that the rights of its members will be injured by the Hyde-Weldon Amendment. The argument fails for two simple reasons: the Hyde-Weldon Amendment only applies to governments, so the private organizations and entities that are members of the Plaintiff plainly are unaffected by the challenged restriction; and, the government entities that are members of the Plaintiffs remain free to provide and refer for abortions and thus are not injured by the provision.

5. See generally Roe v. Wade, 410 U.S. 959 (1974); Planned Parenthood v. Casey, 510 U.S. 1309 (1994). These decisions have created significant philosophical debate and societal dispute and

constitutional duty of governments to provide such reproductive services. See Poelker v. Doe, 432 U.S. 519 (1977). Rather than finding that the constitutional dimensions of that liberty interest compels governments to facilitate or provide abortion services, the Court has concluded that governments may prefer childbirth over abortion as a matter of social policy. See Maher v. Roe, 432 U.S. 464, 475-76 (1977).[6]

The plaintiff seeks a preliminary injunction against enforcement of the Hyde-Weldon Amendment. In bringing this motion, the Plaintiff takes on the significantly burdensome responsibility and duty to demonstrate the facial invalidity of the Hyde-Weldon Amendment, and the additional burden of proving its entitlement to preliminary injunctive relief. The grant of preliminary injunctions is governed by Rule 65 of the Federal Rule of Civil Procedure 65(a). Under Rule 65, this Court may not grant preliminary injunctive relief unless the moving party demonstrates (1) that it is likely to succeed on the merits of its claims; (2) that it will suffer irreparable harm if not granted injunctive relief; (3) that other parties will not suffer substantial harm; and (4) that the public interest is served by an injunction. See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 842-43 (D.C. Cir. 1977). The Plaintiff cannot sustain its burden to obtain a preliminary injunction.

---

have been questioned by several Supreme Court Justices in their dissenting opinions. Such arguments are beyond the scope of this brief. These decisions are merely cited to show the Supreme Court's acceptance of this basic right.

6.   In fact, Congress has expressly acted to further the national interest in preferring childbirth over abortion. For example, the federally funded family planning program – commonly known as Title X – reflects Congress' considered judgment that the preference for childbirth over abortion was sufficiently significant to deny federal funds to proposed Title X grantees that provided or referred for abortion.

First, there is no likelihood of success on the challenge to the Hyde-Weldon Amendment.

The Hyde-Weldon Amendment reflects the judgment of Congress that no funds appropriated under the Departments of Labor, Health and Humans Services, Education, and Related Agencies Appropriations Act, 2005, should be available to government entities – either federal or State – that discriminate against institutions and entities that do not provide, pay for, provide coverage of, or refer for abortions. As explained within, such judgments by Congress are within its Spending Clause power to prefer childbirth over abortion. Such limitations do not deny to agencies, programs, or governments the ability to discriminate in this way. Instead, to discriminate in this way, agencies, programs, or governments simply choose to forego such grant funding.

Second, other parties will suffer if this Court enjoins enforcement of the Hyde-Weldon Amendment. Congress is entitled to craft programs funded by its Spending Clause power and to insist that such programs comport with express parameters of such programs. In addition, with a view toward the broadly held opposition to unrestricted abortion in the United States, Congress was right to consider whether its funding of Labor, Health and Human Services, Education, and related agency programs could be crafted to reflect the legislative preference for childbirth over abortion. In fact, the Hyde-Weldon Amendment does just that and, in the process, extends a solicitous nod to institutions and health care entities, including individuals, that do not participate in abortion services. And those institutions and entities, including individuals, will be adversely affected by the grant of injunctive relief, as we explain below.

I. CONGRESS PROPERLY EXERCISED ITS SPENDING POWER TO PREFER CHILDBIRTH OVER ABORTION IN ENACTING THE HYDE-WELDON AMENDMENT

This case is not about an indefatigable right of would-be government recipients of

appropriated funds to receive federal funds, for no such right exists under the American system of law. Rather, this case is about the power of Congress to define the contours of the programs that it creates and that it funds. While this plaintiff complains about the impact of the Hyde-Weldon Amendment on Title X program grantees, the Amendment is much broader in scope, and serves, in the view of the amici, as a complete prohibition on the granting of any funds appropriated under the Act to discriminating governments, agencies, and programs.

The plaintiff has brought into focus the applicability of the Hyde-Weldon Amendment to Title X grantees.[7] It is important to take stock, however, of the broader application of the Hyde-Weldon Amendment, which restricts all funds appropriated under the Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, 2005. Among major programs to which the Hyde-Weldon Amendment's restriction applies undoubtedly the largest is the Medicaid program,[8] under which State and local government agencies provide medical care assistance to the

---

7. This brief does not address in full the correctness of the plaintiff's assertion that the Hyde-Weldon Amendment puts its members that receive Title X funding in a double bind, due to the effect of apparently inconsistent obligations under the Hyde-Weldon Amendment and a federal regulation, 42 C.F.R. § 59.5(a)(5)(ii). In the view of the amici, it is sufficient to note that if there is a conflict between the federal law enacted by Congress and a federal regulation, then under the Supremacy Clause, the provision of the federal law governs and the inconsistent regulation is, per force, invalid.

8. The Centers for Medicare and Medicaid Services, within the Department of Health and Human Services, describes the medicaid program:

> The program, known as Medicaid, became law in 1965 as a jointly funded cooperative venture between the Federal and State governments to assist states in the provision of adequate medical care to eligible needy persons. Medicaid is the largest program providing medical and health-related services to America's poorest people. The Federal statute identifies over 25 different eligibility categories for which federal funds are available. These statutory categories can be classified in to five broad coverage groups: Children, Pregnant Women; Adults in Families with Dependent children; individuals with disabilities, and individuals 65 or over.

poor.

Of course, the Supreme Court has already sustained the reasonability of a regulatory judgment limiting Title X program funds to providers that do not refer for or provide abortions. See Rust v. Sullivan, 500 U.S. 173 (1991). Here, Congress has simply concluded that the advancement of its policy judgments regarding the preference for childbirth over abortion and regarding the social harm of discrimination against persons who conscientiously decline to participate in abortion practices fully justify the restriction imposed by the Hyde-Weldon Amendment.

Under the Spending Clause, Congress has authority to appropriate federal monies to promote the general welfare, Art. I, § 8, cl. 1. Under the Necessary and Proper Clause, Art. I, § 8, cl. 18, Congress has a corresponding authority to insure that taxpayer dollars appropriated under that power are in fact spent accordingly. See generally McCulloch v. Maryland, 17 U.S. 316 (1819) (rational basis review under the Necessary and Proper Clause); see also, Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 276 (1981) (same); Hanna v. Plumer, 380 U.S. 460, 472 (1965) (same). Congress need not await the thwarting of its will. See, e.g., McCulloch, 17 U.S. at 417 (the power to "'establish post-offices and post-roads'" includes the power to "punish those who steal letters").

In Rust v. Sullivan, 500 U.S. 173 (1991), the Supreme Court rejected First Amendment free speech challenges to a restriction within the federal Title X family planning program, and affirmed

---

Within broad national guidelines which the Federal government provides, each of the states: establishes its own eligibility standards; determines the type, amount, duration, and scope of services; sets the rate of payment for services; and administers its own program. Thus, the Medicaid varies considerably from state to state.

http://www.cms.hhs.gov/states/default.asp (Last visited December 22, 2004).

a 1988 regulation promulgated by the Secretary of Health and Human Services that was intended to clarify certain issues that had arisen in the administration of Title X programs. The Supreme Court noted, "the regulations attached three principal conditions on the grant of federal funds for Title X projects":

> First, the regulations specified that a "Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." . . . Second, the regulations broadly prohibited a Title X project from engaging in activities that "encourage, promote or advocate abortion as a method of family planning." . . . Third, the regulations required that Title X projects be organized so that they are "physically and financially separate" from prohibited abortion activities. . . . To be deemed physically and financially separate, "a Title X project must have [had] an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies [was] not sufficient."

Rust, 500 U.S. at 179-80 (citations omitted). Title X funding recipients challenged these limitations on the use of Title X funding, asserting that "the regulations violate the First Amendment by impermissibly discriminating based on viewpoint . . . ." Rust, 500 U.S. at 192.

But the funding recipients in Rust had no well-made argument that the First Amendment barred Congress from drawing the parameters of a program of funding of family planning activities. The Supreme Court took note, in the first instance, that Congress was well within its sphere of authority to prefer childbirth over abortion. Rust, 500 U.S. at 192. The Supreme Court rejected the argument that a government-funded program providing family planning services violated the First Amendment because it disallowed participants from engaging in abortion counseling or referrals. When the "government appropriates public funds to establish a program, it is entitled to define the limits of that program." 500 U.S. at 194.

Thus, as made plain by the outcome in Rust, Congress is entitled to appropriate funds and

direct their expenditure using criteria that are based on the content of speech and may do so without any violation of the First Amendment right of free speech. Otherwise,

> To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect.

Rust, 500 U.S. at 194 (citation omitted). There remained no doubt after Rust that "the Government [might] choose[] to subsidize one protected right" without being obliged to "subsidize analogous counterpart rights."[9] And, the Supreme Court reaffirmed, "there is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 500 U.S. at 192-193 (citing Maher v. Roe, 432 U.S. 464, 475 (1977).

Decisions of this Circuit are in full accord with the outcome in Rust.

In Barbour v. WMATA, 374 F.3d 1161 (D.C. Cir. 2004), the D.C. Circuit explained that Congress may "condition[ing] its grants or funds to the States upon their taking certain actions that Congress could not require them to take, and acceptance of the funds entails an agreement to the actions." Barbour, 374 F.3d at 1163 (citation omitted). In Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998), the D.C. Circuit overturned an injunction against the enforcement of a ban prohibiting inmates from receiving pornographic materials while in prison and at the expense of the Bureau of Prisons, specifically relying on the Spending Clause and the prior decision of the Supreme Court

---

9.   In reaching this conclusion, the Supreme Court relied on Regan v. Taxation with Representation, 461 U.S. 540 (1983); Harris v. McRae, 448 U.S. 297 (1980); and, Maher v. Roe, 432 U.S. 464 (1977).

in Rust v. Sullivan, 500 U.S. 173 (1991).

Consequently, as in Rust, where the Court held that the "government can, without violating the Constitution, selectively encourage certain activities it believes to be in a public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way," id. at 193, Congress remained free here to continue fine-tuning its Title X family planning program in ways that allow it to pursue the legitimate governmental preference for childbirth over abortion. See also Citizens for the Abatement of Aircraft Noise v. Metro Washington Airport Authority, 917 F.2d 48, 55 (D.C. Cir. 1990) (notes that it is "well established that Congress may use its Spending Clause powers to advance policies to legislate directly"); ACLU v. Mineta, 319 F. Supp. 2d 69, 80 (D.D.C. 2004) (concluding that the challenged restriction and the purpose of the funding do not have to be "particularly closely related" to be upheld, and that there was a paucity of case law "striking down a condition on federal funding solely because it is insufficiently related to the federal interest in the program funded).

From all the foregoing, the amici believe the Court is fully justified in concluding that the Hyde-Weldon Amendment is a permissible restriction on the granting of federal funds under the Department of Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, 2005.

II.  AN INJUNCTION WILL SUBSTANTIALLY BURDEN HEALTH CARE PROFESSIONALS AND ORGANIZATIONS WHO CONSCIENTIOUSLY OPPOSE ABORTIONS.

Alexander Pope wondered, "Who shall decide when doctors disagree?" Pope, An Essay on Man, Moral Essays, and Satires. While Pope contemplated the problem of doubt, the present case questions whether Congress may insist that funds appropriated by it are not used by grantees that

discriminate against persons of conscience. And, in the instant case, to answer Pope's question, it falls to this Court to decide the issue when would-be grantees and Congress disagree.

Today, a Catholic health care agency in the State of California is eligible to participate in medicaid programs administered by the State of California and funded under the recently enacted appropriation. Today, a pharmacist employed in a state hospital that receives federal funds under the recently enacted appropriation can refuse to dispense the abortion pill, RU-486 (Mifepristone) knowing that state and local government agencies will not endanger the stream of federal funds by engaging in discrimination against her for refusing to do so. Today, health care entities, including individuals, and institutions, large and small, enjoy a small breathing space from otherwise intrusive governmental demands that abortion services be provided or abortion referral be given. These doctors, pharmacists, nurses, hospital associations, health maintenance organizations, and other entities have the benefit of the funding restrictions imposed by the Hyde-Weldon Amendment.

And if this Court enjoins enforcement of the Hyde-Weldon Amendment these entities, groups and individuals will be injured by the green light that such an injunction would seem to send to governments, federal, state and local, that such discrimination is permissible.

A variety of cases have already arisen involving disagreements over the legality and moral propriety of abortion. Those cases have involved the medical procedures themselves or counseling related to it. When a health care professional refuses to provide abortion related services and the organization employing that professional demands that such services be provided, satisfactory solutions may not easily be found. But as we explain below, a network of State laws is already developing to provide protection from discrimination for such conscientious objectors. The dispute also has produced a literature on the competing rights and interests of employers and medical

professionals.[10]

In this area, the discussion often focuses on the rights of doctors and medical students.[11] More recent analysis has expanded to include private hospitals, nurses, and pharmacists.[12]

Responding to the legal quandaries, many States have enacted statutory protections for medical professionals whose opposition puts them at risk for adverse employment action. State-law based conscience clauses are a line of defense for persons of conscience who seek to provide health care while maintaining their individual integrity.[13] And if that

---

10. See, e.g., Bruce G. Davis, Defining the Employment Rights of Medical Personnel Within the Parameters of Personal Conscience, 1986 Detroit C.L. Rev. 847.

11. See, e.g., Judith F. Daar, A Clash at the Bedside: Patient Autonomy v. A Physician's Professional Conscience, 44 Hastings L.J. 1241 (1993); Edmund D. Pellegrino, Patient and Physician Autonomy: Conflicting Rights and Obligations in the Physician-Patient Relationship, 10 J. Contemp. Health L. & Pol'y 47 (1994); Michael J. Frank, Note, Safeguarding the Consciences of Hospitals and Health Care Providers: How the Graduate Medical Education Guidelines Demonstrate a Continued Need for Protective Jurisprudence and Legislation, 14 St. Louis U. L.J. 311 (1996); Lynn D. Wardle, Protecting the Rights of Conscience of Health Care Providers, 14 J. Legal Med. 177 (1993)

12. See, e.g., David B. Brushwood, The Professional Capabilities and Legal Responsibilities of Pharmacists: Should "Can" Imply "Ought"?, 44 Drake L. Rev. 439 (1996); Bryan A Dykes, Note, Proposed Rights of Conscience Legislation: Expanding to Include Pharmacists and Other Health Care Providers, 36 Ga. L. Rev. 565 (2002); David W. Hepplewhite, A Traditional Legal Analysis of the Roles and Duties of Pharmacists, 44 Drake L. Rev. 519 (1996); Donald W. Herbe, Note, The Right to Refuse: A Call for Adequate Protection of a Pharmacist's Right to Refuse Facilitation of Abortion and Emergency Contraception, 17 J.L. & Health 77 (2003).

13. See, e.g., Alaska Stat. § 18.16.010(b) (Michie 2004) (permanently enjoined as applied to public, "quasi-public" nonsectarian facilities in Valley Hosp. Assoc, Inc. v. Mat-Su Coalition for Choice, 948 P.2d 963 (Alaska 1997) (protecting conscientious objectors to abortion); Ark. Code Ann. § 20-16-304 (2004) (protecting the right of individuals and private institutions from participating in dissemination of contraceptive and other health care information); Ariz. Rev. Stat. Ann. § 36-2151 (West 2004) (protecting conscientious objectors to abortion); Cal. Health & Safety Code § 123420 (West 2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Colo. Rev. Stat. Ann. § 18-6-104 (West 2004) (protecting

---

conscientious objectors to abortion); Ct. Agencies Regs. § 19-13-D54(f) (2004) (protecting conscientious objectors to abortion); Del. Code Ann. tit. 24, § 1791 (2004) (protecting conscientious objectors to abortion); Fla. Stat. Ann. § 390.0111 (8) (West 2004) (protecting conscientious objectors to abortion); Ga. Code Ann. § 16-12-142 (2004) (protecting conscientious objectors to abortion); Haw. Rev. Stat. Ann. § 453-16(d) (Michie 2004) (protecting conscientious objectors to abortion); Idaho Code § 18-612 (Michie 1997) (protecting conscientious objectors to abortion); 745 Ill. Comp. Stat. 70/1-14 (2004) (protecting the right of conscience of all health care providers); 720 Ill. Comp. Stat. 510/13 (2004) (protecting conscientious objectors to abortion); Ind. Code. §§ 16-34-1-3 to 16-34-1-7 (2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Iowa Code §§ 146.1-146.2 (2003) (protecting right of conscience of individuals and private institutions from participating in abortions); Kan. Stat. Ann. §65-443, 65-444, 65-446, 65-447 (2003) (protecting individuals who object to participating in abortion or sterilization); Ky. Rev. Stat. Ann. § 311.800 (Michie 2004) (protecting conscientious objectors to abortion); La. Rev. Stat. Ann. §§ 40:1299.31-1299.33 (West 2004) (protecting conscientious objectors to abortion); Me. Rev. Stat. Ann. tit. 22, §§ 1591-1592 (West 2004) (protecting conscientious objectors to abortion); Md. Code Ann. Health-Gen. II § 20-214 (2003) (protecting providers from participating in abortion, sterilization, and artificial insemination); Mass. Gen. Laws ch. 112, § 12I; ch. 272 § 21B (2004) (protecting individuals who object to participating in abortion or sterilization); Mich. Comp. Laws. §§ 333.20181-20184, 333.20199 (2004) (protecting conscientious objectors to abortion); Minn. Stat. Ann. § 145.414 (West 2003) (protecting conscientious objectors to abortion); Mo. Ann. Stat. §§ 188.100, 188.105, 188,110, 188.115, 188.120 (West 2004) (protecting conscientious objectors to abortion); Mont. Code. Ann. § 50-20-111 (2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Neb. Rev. Stat. §§ 28-337 to 341 (2004) (protecting conscientious objectors to abortion); Nev. Rev. Stat. Ann. §§ 449.191 (Michie 2004) (protecting right of conscience of individuals and private institutions from participating in abortions); N.J. Stat. Ann. §§ 2A:65A-1 to 2A:65A-4 (West 2004) (protecting individuals who object to participating in abortion or sterilization); N.M. Stat. Ann. § 30-5-2 (Michie 2004) (protecting conscientious objectors to abortion); N.Y. [Civ. Rights] Law § 79-i (McKinney 2004) (protecting right of conscience of individuals from participating in abortions); N.C. Gen. Stat. §§ 14-45.1(e), 14-45.1(f) (2004) (protecting conscientious objectors to abortion); N.D. Cent. Code § 23-16-14 (2004) (protecting conscientious objectors to abortion); Ohio Rev. Code Ann. § 4731.91 (Anderson 2004) (protecting conscientious objectors to abortion); Okla. Stat. Ann. tit. 63, § 1-741 (West 2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Or. Rev. Stat §§ 435.475, 435.485 (2004) (protecting conscientious objectors to abortion); Pa. Cons. Stat. Ann. tit. 43, § 955.2 (West 2004) and Pa. Cons. Stat. Ann. tit. 18, § 3213(d) (West Supp. 1999) (protecting providers who object to participating in abortion, abortifacients, or sterilization); R.I. Gen. Laws § 23-17-11 (2003) (protecting right of conscience of individuals from participating in abortions or sterilizations); S.C. Code Ann. §§ 44-41-40, 44-41-50 (Law Co-op. 2004) (protecting right of conscience of individuals and private institutions from participating in abortions); S.D. Codified Laws §§ 34-23A-11 to 34-23A-15 (Michie 2004) (protecting conscientious objectors to

line of defense has been erected by so many States, for what kinds of circumstances is the line needed?

As explained in the Interest of Amici, the ACLJ represents medical professionals that have suffered adverse employment action because of their conscientious opposition to participating in the provision of abortion services. Some of those stories help to fill out the balance that this Court must draw when considering the request for injunctive relief.

In 2002, the ACLJ represented Cynthia Day of Marrero, Louisiana. Day, a public-health nurse at a state clinic in New Orleans, was threatened with termination for refusing to dispense pregnancy-ending "morning after" pills because of religious objections. Marrero filed a complaint with the EEOC and the Louisiana Commission on Human Rights. Soon thereafter, the assistant secretary of Louisiana's Department of Health and Hospitals rescinded its threat of dismissal or suspension and accommodated Ms. Day's religious and conscientious beliefs.

In 2001-02, the ACLJ represented a nurse in <u>Diaz v. Cty. of Riverside Health</u>, 5:00-CV-

---

abortion); S.D. Codified Laws § 36-11-70 (2004) (protecting pharmacists' right of conscience in dispensing drugs that cause abortions, assisted suicide, or euthanasia); Tenn. Code Ann. §§ 39-15-204 and 39-15-205 (2004) (protecting conscientious objectors to abortion); Tex. [Occ.] Code Ann. § 103.001-.004 (Vernon 2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Utah Code Ann. § 76-7-306 (West Supp. 1998) (protecting right of conscience of individuals and private institutions from participating in abortions); Utah Code Ann. § 76-7-306 (2004) (protecting right of conscience of individuals and private institutions from participating in abortions); Va. Code Ann. § 18.2-75 (Michie 2004) (protecting conscientious objectors to abortion); Wash. Rev. Code §§ 9.02.150, 48.43.065, 70.47.160 (2004) (right of conscience protection for individuals and religious institutions); W. Va. Code § 16-2F-7 (2004) (protecting the right of conscience of individuals from participating in abortions); Wis. Stat. Ann. § 253.09 (West 2004) (protecting the right of health providers objecting to abortion or sterilization); Wyo. Stat. Ann. §§ 35-6-105, 35-6-106 and 35-6-114 (Michie 2004) (protecting right of conscience of individuals and private institutions from participating in abortions).

00936 (C.D. Cal.),[14] in which the plaintiff was fired because of her refusal to dispense pills with an abortifacient mechanism of action. Diaz's refusal came after supervisors with the county health department issued an order requiring that all nurses dispense any and all drugs prescribed by the county clinics' physicians. Unlike Diaz, who did not willfully leave her job, four of Diaz's colleagues had resigned their positions because of their own religious and conscientious refusal to dispense abortifacient drugs.

In 2001, the ACLJ represented a pharmacist-employee of the federal Indian Health Services program in an EEO matter captioned Paula Koch v. Indian Health Service, IHS-027-01. There, the pharmacist-employee was told she would have to dispense abortifacient drugs when presented with such a prescription. Koch refused on religious and conscientious grounds and she was threatened with termination if she did not change her position. Koch complained to the EEOC and, with the help of the ACLJ, the matter was eventually resolved. Koch's position as a pharmacist was retained, with the understanding that she would not have to dispense any drugs if doing so would violate her conscientious beliefs.

The Plaintiff in the present case simply cannot demonstrate that the requested injunction will not cause injury. Yet it is the Plaintiff's burden to show that the grant of the requested preliminary injunction will not injure others. Today, organizations such as health maintenance organizations, religiously affiliated health associations, and individuals such as nurses, pharmacists, physicians' assistants, and, indeed, doctors, all have obtained a small modicum of protection with the enactment of the Hyde-Weldon Amendment. Admittedly, the shield established by the Hyde-Weldon

---

14. The case was eventually brought to trial, and plaintiff prevailed on all her legal claims.

Amendment is limited: a government can choose to forego funds and engage in such discriminatory practices as it chooses (subject, of course, to state law conscience clause considerations). But the Hyde-Weldon Amendment is a welcome aid to such persons of conscience. An injunction suspending its enforcement would injure such associations, organizations and individuals.

## CONCLUSION

For the foregoing reasons, and as argued by the Defendants, the motion for the preliminary injunction should be denied.

Dated: December 22, 2004.

        Respectfully submitted,

        Jay Alan Sekulow*+
        American Center for Law and Justice, Inc.
        1000 Regent University Drive
        Virginia Beach, VA

        _____
        James Matthew Henderson, Sr. (#452639)
         *Counsel of Record*
        Colby M. May (#394340)
        American Center for Law & Justice
        201 Maryland Avenue NE
        Washington, DC 20002
        (202) 546-8890

        *Attorneys for Amici Curiae*

        *\*not admitted this jurisdiction*
        *+motion for special admission filed*